# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

N° 06-CV-5664 (JFB) (AKT)

———————————

GILBERT MANIGAULT,

Plaintiff,

VERSUS

GOOD SAMARITAN HOSPITAL MEDICAL CENTER,

Defendant.

———————————

MEMORANDUM AND ORDER
September 2, 2008

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff *pro se* Gilbert Manigault ("plaintiff" or "Manigault") brought this action on October 19, 2006 against his former employer, defendant Good Samaritan Hospital Medical Center ("defendant"), alleging employment discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Specifically, Manigault worked as a custodian at Good Samaritan Nursing Home (the "nursing home") – which defendant owns and operates – and alleges that, because plaintiff is African-American, the nursing home failed to promote him, and ultimately terminated him.

Defendant now moves for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, after carefully reviewing the record in this case – including the complete transcript of plaintiff's deposition and his other written submissions – the Court grants defendant's motion in its entirety. In particular, the undisputed evidence demonstrates that, during Manigault's tenure at the nursing home (approximately three years), plaintiff received numerous Disciplinary Action Notices, as well as a three-day unpaid suspension, because of his poor work performance and inappropriate behavior. Indeed, four nursing home managers, all of whom worked or interacted with plaintiff during his employment, have submitted affidavits describing in detail plaintiff's inability to perform the functions of the job in a satisfactory manner, including plaintiff's (1) taking unauthorized breaks; (2) smoking while working; (3) engaging in a

verbal altercation with a co-worker at work; (4) failing to complete tasks in a timely manner;(5) presence in an unauthorized area of the nursing home; and (6) failure to comply with the nursing home's infectious disease control policy, including plaintiff's failure to wash his hands after handling refuse.[1] The affidavits also recount the managers' unsuccessful efforts to train and counsel plaintiff in order to avoid such errors and improprieties. In his deposition and in his vague and conclusory opposition to the motion, although plaintiff tries to dispute or explain some of these deficiencies in his performance, he does not dispute that all of these complaints were made or that virtually all of these the incidents occurred. Moreover, he offers absolutely no evidence from which a rational trier of fact could conclude that defendant maintained a hostile work environment or that the proffered reasons for defendant's failure to promote plaintiff and for plaintiff's termination – namely, his inability to perform the job and his inappropriate behavior – were a pretext for race discrimination. Indeed, as the Court explains in detail *infra*, plaintiff barely mentioned the issue of race in his deposition or in his opposition papers. Accordingly, his Title VII claims cannot survive summary judgment.

---

[1] Defendant has also provided undisputed evidence of plaintiff's failure to provide accurate information on his job application – namely, plaintiff's omission of his criminal history, including convictions for menacing and for facilitation of possession and sale of cocaine, as well as a two-year prison term. Pursuant to defendant's policies, such an omission would provide an independent ground for termination. However, the Court has not taken this evidence into account on the instant motion because defendant did not learn of plaintiff's omission until after his termination.

# I. FACTS[2]

The Court has taken the facts described below from the parties' depositions, affidavits, and exhibits, and from defendant's Rule 56.1 statement of facts ("Def.'s 56.1").[3]

---

[2] Where only defendant's 56.1 Statement is cited, the facts are taken from defendant's 56.1 statement, and plaintiff does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

[3] As defendant points out in its reply brief, plaintiff has failed to comply with Local Civil Rule 56.1 in that he did not properly respond to Def.'s 56.1. However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04-CV-2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Here, although plaintiff did not comply with Rule 56. 1, his written submissions – and, in particular, the affidavit he submitted in opposition to the instant motion ("Pl.'s Aff.") – refer generally to the relevant portions of the record upon which plaintiff is relying. Thus, both the moving party and the Court are aware of the portions of the record upon which plaintiff relies in opposition to the motion, and defendant has not identified any prejudice arising from plaintiff's failure to comply with Rule 56.1. Accordingly, in the exercise of its broad discretion, the Court will not reject plaintiff's opposition based upon his failure to comply with Rule 56.1, but rather has fully considered plaintiff's opposition to defendant's summary judgment motion on the merits. *See, e.g., Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 156 n. 2 (2d Cir. 2003) (excusing failure to comply with Local Civil Rule 56.1 where the relevant facts were apparent from the parties' submissions and there was no evidence

Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001).

## A. Background

Defendant is a not-for-profit, acute healthcare facility located in West Islip, New York. (Def.'s 56.1 ¶ 1.) The nursing home is a full-time skilled nursing facility located in Sayville, New York. (Def.'s 56.1 ¶ 2.)

Beginning on September 11, 2003, defendant employed plaintiff at the nursing home as an "on call" custodian in the Housekeeping and Linens Department. (Def.'s 56.1 ¶ 4.) As an "on call" custodian, plaintiff did not have a set work schedule, and was required to work day, night, and weekend work shifts according to the operational needs of the nursing home. (Def.'s 56.1 ¶ 5.) Plaintiff worked less than thirty hours per week. (Def.'s 56.1 ¶ 4.)

On December 29, 2003, plaintiff was transferred to the position of "part time" custodian. (Def.'s 56.1 ¶ 8.) In that position, plaintiff was permitted to work for sixty hours during each two-week work period. (Def.'s 56.1 ¶ 8.)

At all relevant times, Joseph Martelack, the nursing home's Director of Housekeeping, Linens, and Security ("Martelack"), was Manigault's immediate supervisor. (Def.'s 56.1

---

of prejudice from the defect); *Williams v. R.H. Donnelley Inc.*, 199 F. Supp. 2d 172, 174 n.1 (S.D.N.Y. 2002) (excusing failure to submit statement pursuant to Local Civil Rule 56.1 where the facts were set forth in the party's memorandum of law).

¶ 9.) In Martelack's absence, plaintiff was supervised by Patricia Muir, the nursing home's former Director of Nursing Services ("Muir"), Michelle Brady, the nursing home's former In-Service Director ("Brady"), and other supervisory nursing staff. (Def.'s 56.1 ¶ 10.)

## B. Plaintiff's Duties

As a custodian, Manigault's duties included: picking up and removing soiled linens, dusting, cleaning air vents, mopping, buffing, stripping and finishing floors, vacuuming carpets, and collecting and removing waste (including infectious waste) from residents' rooms and common areas. (Def.'s 56.1 ¶ 6.)

The nursing home cares for elderly patients with varying degrees of mobility impairments, and many of the patients have compromised immune systems. (Def.'s 56.1 ¶¶ 11-12.)

## C. Defendant's Policies

### (1) Hand Washing Policy

The nursing home's Hand Washing Policy provides that all employees must wash their hands with soap and water (1) before beginning work; (2) when their hands are obviously soiled; (3) before and after caring for each patient or after any prolonged patient contact; (4) before preparing or administering medications; (5) before passing out trays or handling food; (6) before and after special patient treatments; (7) after collecting and handling or administering a bedpan; (8) after using the toilet; (9) after blowing or wiping their nose; (10) before and after eating; (11) after any contaminated contact; (12) after finishing work; and (13) whenever common sense dictates that hand

washing may be necessary to prevent the spread of infection. (Def.'s 56.1 ¶ 14.) Further, the hand washing policy provides that the "USE OF GLOVES DOES NOT REPLACE HAND WASHING." (Def.'s 56.1 ¶ 16) (emphasis in original).

### (2) Garbage/Waste Removal Policy

The nursing home's policy concerning the appropriate removal of garbage/waster is as follows: (1) the employee must wash his hands; (2) put on a new, unused set of rubber gloves prior to entering a resident's room; (3) remove the garbage/waste and place it in an appropriate plastic bag; (4) place the bag in a sanitary garbage cart and close the lid to the cart; (5) remove and discard the used gloves; (6) wash his hands; and (7) move the garbage cart to the next room. (Def.'s 56.1 ¶ 17.) This procedure is repeated for each resident's room. (Def.'s 56.1 ¶ 17.)

### D. Plaintiff's Training in Defendant's Policies

During the nursing home's Orientation Program and at annual "in-service" training, plaintiff was trained in defendant's policies and procedures relating to the control of infectious materials, including proper hand hygiene policies and procedures and the prevention of the transmission of germs. (Def.'s 56.1 ¶ 7; *see also* Def.'s 56.1 ¶ 18.) All employees also received annual written examinations in infection control. (Def.'s 56.1 ¶ 19.)

In particular, on or about September 17, 2003, Brady personally conducted Manigault's new employee orientation. (Def.'s 56.1 ¶ 20.) Brady trained plaintiff with regard to the nursing home's infectious materials control policy, hand washing hygiene procedures, and "isolation transmission precaution procedures." (Def.'s 56.1 ¶ 21.) Plaintiff also personally participated in the nursing home's annual in-service training program to reinforce all of the nursing home's infectious materials control policies and procedures. (Def.'s 56.1 ¶ 22.) Further, on August 22, 2003, plaintiff signed a Hospital Personnel Handbook Receipt acknowledging that he had received the policies and procedures of defendant as outlined in the Personnel Handbook and accepted these policies and procedures as conditions of his employment. (Def.'s 56.1 ¶ 23.)

### E. Defendant's Grievance Procedures

Defendant maintains an Individual Grievance Procedure, which is contained in the Personnel Handbook. (Def.'s 56.1 ¶ 26.) The Grievance Procedure provides for a three-step process for employees to grieve, among other things, decisions affecting their employment. (Def.'s 56.1 ¶ 27.) Specifically, in the first instance (Step One), grievances or complaints are directed to the employee's Department Head. (Def.'s 56.1 ¶ 27.) If the employee is not satisfied with the resolution of the matter, he may contact the Vice President of Human Resources. (Def.'s 56.1 ¶ 27.) If the employee is still unsatisfied with the resolution, he may contact the President of the Hospital. (Def.'s 56.1 ¶ 27.) Plaintiff acknowledged at his deposition that he understood these grievance procedures. (Manigault Dep. at 116-18.)

According to Lori Spina, the Vice President of Human Resources, plaintiff never contacted her with respect to "his receipt of written or verbal disciplinary action." (Spina Aff. ¶ 9.) Spina also asserts that plaintiff never complained to her "with respect to any request for transfer to an open position." (Spina Aff. ¶ 9.) At his deposition, plaintiff agreed that he never complained regarding "what [he] did at work." (Manigault Dep. at 118.) However,

he said that he remembered "making a complaint about a full-time position." (Manigault Dep. at 118.)

### F. Defendant's Uniform Requirements

According to Martelack,

> [a]s per the Nursing Home's dress code policy, housekeeping employees (or 'custodians') are required to dress neatly, in gray shirts and pants. Housekeeping employees are permitted to wear t-shirts or button down shirts, as long as they are neat and gray in color. Similarly, housekeeping employees must wear pants that are gray in color. Denim pants are permitted as long as they are gray in color.

(Martelack Aff. ¶ 7.) At his deposition, Martelack testified that Manigault complied with the dress code. (Martelack Dep. at 41.)

In his affidavit in opposition to the instant motion, however, plaintiff states: "Fact: Second week after being hired, I was mandated to wear a uniform. It composed of a complete matching grey top and bottom. This rule was issued by my supervisor J. Martelack. Several white employees in my department wore blue jeans and white t-shirts without consequence." (Pl.'s Aff. at 2.)

### G. Chronology of Manigault's Disciplinary Issues

Set forth below is a chronology of the specific disciplinary issues of plaintiff's for which defendant has provided evidence in support of the instant motion. As a threshold matter, the Court notes that plaintiff does not dispute that virtually all of these infractions occurred. He does, however, consistently characterize them as "bogus immaturity. . . You can write that up about a child in preschool, uncooperative behavioral problems." (Manigault Dep. at 217.)

#### (1) Unauthorized Break

According to Martelack, on or about December 9, 2004, Manigault "failed to respond to a page from the nursing staff to mop up a spill. Plaintiff was observed by nursing staff on an unauthorized [break] outside of the building smoking a cigarette. Plaintiff was the only custodian on duty at that time." (Martelack Aff. ¶ 12.) On December 10, 2004, Martelack counseled Manigault that he must obtain prior authorization from a supervisor before taking a break and issued plaintiff a "Disciplinary Action Notice" to that effect. (Martelack Aff. ¶ 13; Disciplinary Action Notice, dated Dec. 10, 2004.)

At his deposition, plaintiff testified that he was not taking a break, but actually cleaning the grounds outside of the building. (Manigault Dep. at 138.) The following colloquies then ensued:

> Q: And that's what you were doing. You were smoking when you were working and you weren't supposed to be doing that, isn't that correct?
> A: You know what, whatever. Yeah, I was smoking. So what?
>
> ***
>
> Q: So the answer is you are not supposed to smoke while you work, correct?
> A: Yes, that's correct.

Q: And you were smoking, correct?
A: I was smoking.
Q: And you were working, correct?
A: I was working.
Q: You were not on an authorized break, correct?
A: No.

(Manigault Dep. at 138, 162-63.)

### (2) Failure to Use Proper Sanitary Garbage Cart Procedures

According to Martelack, on or about February 7, 2005, "nursing staff observed Plaintiff in the North Unit of the Nursing Home carrying soiled linens and bags that contained garbage to the Nursing Home's garbage dumpster without utilizing the sanitary garbage cart. On February 8, 2005, [Martelack] counseled Plaintiff that he must follow the Nursing Home's infectious materials control policy and use the garbage cart to remove such materials from the Nursing Home. (Martelack Aff. ¶ 14.) Martelack memorialized this conversation in a written memorandum. (Martelack Exh. F.)

### (3) Failure to Complete Assigned Tasks in Timely Manner

According to Martelack, on February 14, 2005, he directed Manigault to vacuum the carpet in the front area of the nursing home between 2 p.m. and 3 p.m. that day. (Martelack Aff. ¶ 15.) According to Martelack, plaintiff "failed to complete the task before he left work for the day." (Martelack Aff. ¶ 15.) Martelack states that, on February 15, 2005, he counseled plaintiff to complete his assigned tasks in a timely manner. (Martelack Aff. ¶ 15; *see also* Handwritten Notes of Martelack, dated February 15, 2005 (memorializing February 14,

2005 incident).) However, according to Martelack, on March 4, 2005, plaintiff "once again failed to complete his job responsibilities." (Martelack Aff. ¶ 16.)

With respect to his failure to vacuum as directed, plaintiff testified as follows at his deposition:

Q: Were you ever asked to vacuum a front carpet between 2:00 and 3:00 p.m. and not complete that task?
A: Maybe.

(Manigault Dep. at 172.) Manigault further stated that he could not remember failing to complete a task "unless someone called [him] to do something else." (Manigault Dep. at 173.)

### (4) Altercation With Co-Worker

On May 25, 2005, Maryann Ost, a supervising registered nurse at the Nursing Home, witnessed a verbal altercation between Manigault and another housekeeping employee, Timothy Kemesis ("Kemesis"). (Muir Aff. ¶ 11.) Ost separated Manigault and Kemesis and brought them to Muir's office. (Muir Aff. ¶ 11.) Along with Brady, Muir informed both Manigault and Kemesis that their behavior would not be tolerated and that "any repeat of such conduct in the future would result in further disciplinary action, up to and including termination of employment." (Muir Aff. ¶¶ 12-13.) Both Manigault and Kemesis received Disciplinary Action Notices. (Muir Aff. ¶¶ 12-13.) Kemesis is white. (Muir Aff. ¶ 14.) According to Muir, Manigault and Kemesis "received the same disciplinary action with respect to the altercation. . . ." (Muir Aff. ¶ 14.)

At his deposition, Manigault testified as follows regarding this altercation:

> Q: How would you describe your behavior during this verbal altercation with Tim Kemisis?
> A: I was upset.
> Q: How close were you standing to Mr. Kemisis during this?
> A: We were nose to nose at one point.
>
> ***
>
> Q: But you were in his face, were you not, sir?
> A: No, he was in my face.
> Q: And you didn't back away, isn't that correct?
> A: I did not.
>
> ***
>
> A: And he invited me outside and that's when Maryanne got between him and I and it was over.
> Q: Had she not got in between you, were you guys going outside?
> A: I wasn't.
> Q: But you told him that you would?
> A: No. I didn't tell him that I would.
> Q: But you told him to go ahead, bounce me off your knee?
> A: Oh, yes. I did tell him that.
> Q: Were you ready for a fight?
> A: If necessary, sure.
> Q: Did it occur to you to just walk away from it?
> A: I was trying to walk away, but when somebody is following you talking to your neck, you

are going to turn around and ask that person to back off?

(Manigault Dep. at 191-92. 199-200.)

### (5) Additional Unauthorized Break

According to Muir, on or about June 15, 2005, she "observed Plaintiff watching television in the Nursing Home's patient recreation room. Plaintiff was on an unauthorized break in the recreation room, watching the television by himself. Plaintiff was not performing any work in the patient recreation room and did not have authorization to be in that area. It is the policy of the Nursing Home that employees are not permitted to utilize patients' recreational areas under any circumstances." (Muir Aff. ¶ 15.)[4]

#### a. Suspension Without Pay

According to Martelack, on or about June 17, 2005, Martelack counseled plaintiff that he had to obtain authorization for breaks and take such breaks in designated areas. (Martelack Aff. ¶ 18.) Martelack also suspended plaintiff without pay for three days, in part because of the above-referenced incident on June 15, 2005. (Def's 56.1 ¶ 54; *see also* Disciplinary Action Notice, dated June 17, 2005.) According to Martelack, Manigault's work performance did not improve upon his return to work. (Martelack Aff. ¶ 18.)

---

[4] According to plaintiff, he was not watching the television, but fixing it on behalf of the residents. (Manigault Dep. at 131.) He could not recall whether fixing televisions was part of his job description. (Manigault Dep. at 131.)

## (6) Presence in Unauthorized Area

According to Brady, on May 2, 2006, she observed Manigault speaking with a Nursing Aide "while the Nursing Aide was feeding a resident in the Day room of the Nursing Home. There was no legitimate reason for Plaintiff to be in that area or to engage the Nursing Aide in conversation." (Brady Aff. ¶ 16.) According to Martelack, "[i]t is Nursing Home policy that housekeeping staff are not to engage in a conversation or be present in an area when residents are being fed." (Martelack Aff. ¶ 19; *see also* Disciplinary Action Notice, dated May 9, 2006.)

At his deposition, plaintiff testified as follows regarding this incident:

> Q: Should you be talking to a nursing aide while they are feeding a resident?
> A: I'm not going to answer that question. I refuse to answer something so stupid. I'm not answering that.
> Q: It's a simple question, sir?
> A: It's a simple, stupid question. I just told you. People ask questions all day long of anybody and everybody in that building. . . . So for me to ask an employee something or an employee other than a housekeeper to ask me a question, sure. I will stop what I'm doing and answer that question. I don't see that as wrong at all.

(Manigault Dep. at 237-38.)

## (7) Violation of Hand Washing Policy

According to Brady, on May 9, 2006, she observed Manigault "pushing a clean garbage cart between patient rooms with the same dirty gloves he had utilized to collect garbage from a previous patient's room. Plaintiff had failed to remove his used gloves and wash his hands between tasks." (Brady Aff. ¶ 17.)

Further, Brady stated that, on May 10, 2006, she and Chris Cardinal, the nursing home's registered nurse, "met with Plaintiff concerning this latest conduct. [Brady] directed Plaintiff to wash his hands before putting on clean gloves and after removing soiled gloves. [Brady] further advised Plaintiff that he must use new gloves with every task. Plaintiff acknowledged that he failed to change his gloves and wash his hands between tasks." (Brady Aff. ¶ 18; *see also* Disciplinary Action Notice, dated May 10, 2006 (containing notation that "[e]mployee admits to infraction however refuses to sign").)

In his opposition papers, plaintiff stated as follows regarding this incident with the soiled gloves:

> The written statement says I was observed of the infraction of this waste policy, if I was being observed, I don't understand why. I was accused of pushing a clean infectious waste container with dirty gloves. This is known as an oxymoron. . . .
>
> The resident was not present in the room I was cleaning, disposing of infectious waste.

Upon leaving the room, I deposed [sic] contaminated waste in the underlined contaminated cart. I then pushed that same underlined contaminated cart into the next room before changing gloves. Before I entered the next room, the gloves were deposited into the waste basket located on my cart.

Upon entering the next room of duty, I opted not to use the residents personal Restroom to wash my hands. Instead I reasoned to use the hand sanitizer located on the wall in the Residents room. This hand sanitizer is found in every room from every wing in this facility. I reasoned that this tactic would prove timelier efficient, Safer for me and the Residents as well as other staff members in the building. This was explained to supervisor M. Brady. I have witnessed this Nursing home close entire wings in the facility due to infection spreading and attempts to confine and extinguish infection spreading. Apparently, she had put this in other words. Mrs. Brady the accuser was not questioned in any deposition but rather made an untrue statement under oath. This would suggest that because M. Brady is a department head and very good friends with V.P. in Human Resources, the accusations were put forth and allowed as a Judgment against me. I feel that I had done the right thing as to protect myself, patients and co-workers. Many residents have infectious illnesses that could spread. I would not jeopardize my health by not taking simple precautions such as changing gloves, washing hand etc. That just wouldn't make sense.

(Manigault Aff. at 1-2) (emphases in original).

Further, at his deposition, Manigault engaged in the following colloquy regarding his adherence to the infectious disease control policy:

A: Okay. I'll tell you how I was trained. I was trained to wear gloves. Go in a room, close the bags and dispose of them in the proper receptacle, which is an infection control container.
Q: As part of the procedure, are you supposed to wash your hands before you put on gloves?
A: Not that I know of.
Q: So you put on the gloves and you go into a room, is that correct?
A: Pretty much, yeah.
Q: And you pick up the refuse, is that correct?
A: Yes.
Q: Do you then take off the gloves and wash your hands?
A: Yes, of course.
Q: So you're supposed to wash your hands after you take off the gloves?
A: Of course.

Q: So you've left one room now. You've put on gloves. You've picked up refuse –

A: Wait a minute. Wait a minute. I'm not going to tell you I wash my hands from each room to each room less than five feet apart. No, I did not do that.

Q: Did you change your gloves from room to room?

A: Constantly. I'm scared of germs.

\*\*\*

Q: So, between taking off those gloves after you throw the garbage in the receptacle, you're now outside the room, is that correct?

A: That's right.

Q: And you don't wash your hands, correct?

A: Sometimes.

Q: Sometimes?

A: Sometimes.

Q: What do you do next?

A: What do you mean, what do I do next?

Q: After you wash your hands, what do you do next?

A: Do whatever I'm doing. I might not be handling gloves after – handling garbage after I wash my hands. I might go on to doing something else. I'm never doing garbage by myself.

Q: So there are times when you just change the gloves and don't wash your hands in between rooms, correct?

A: Say it again.

Q: There are times when you discard a pair of gloves, you

don't wash your hands and then you put on a new pair of gloves, correct?

A: Yeah.

Q: And then you go into the next room, correct?

A: Maybe.

\*\*\*

Q: But you will not wash your hands after –

A: I'm not saying I won't wash my hands, but if I'm not near a bathroom or a wash facility, why would I walk 15, 20 feet to find somewhere to wash my hands to go into the next room? No. No. I did not do that.

Q: So you would walk into the next room without washing your hands, correct?

A: But with a new pair of gloves on.

Q: But you didn't wash your hands, correct?

A: No.

Q: No, you didn't wash your hands?

A: No.

(Manigault Dep. at 122-23, 125-26)[5]

_____

[5] In addition to the aforementioned undisputed disciplinary infractions, defendant also claims that plaintiff failed to provide notice for an unscheduled day off and improperly stored personal items on the nursing home premises. However, plaintiff disputes the validity of these infractions and, therefore, the Court does not rely upon them on the instant motion.

## H. Transfer Opportunities

### (1) Full-Time Position

Pursuant to nursing home policy, employees with a disciplinary warning in the preceding 12 months are not eligible for transfer to a different position at the nursing home. (Def.'s 56.1 ¶ 63.)

On or about August 29, 2005, Muir posted a full-time housekeeping position in the nursing home on the bulletin board located outside of the employee cafeteria. (Def.'s 56.1 ¶ 64.) According to defendant, John Baxter ("Baxter") was the only person to apply for the position, which he ultimately received. (Def.'s 56.1 ¶¶ 66-67.)

At his deposition, however, plaintiff stated that he "attempted to apply for the position [Baxter received] by going into the office and talking to a supervisor. . . ." (Manigault Dep. at 321.) Manigault stated that he was not sure whether he actually submitted a written application for the position. (Manigault Dep. at 322.)[6] Defendant asserts that, because of plaintiff's disciplinary history, he would not have been eligible for the position until June 2006. (Def.'s 56.1 ¶ 71.)[7]

---

[6] Elsewhere in his deposition, however, plaintiff stated that he did not submit a written application for the position. (Manigault Dep. at 120.) In any event, whether or not he actually applied for the position is immaterial, because – as set forth *infra* – plaintiff's disciplinary history disqualified him from any such transfer or promotion.

[7] In fact, at his deposition, plaintiff conceded that his disciplinary history disqualified him from the position:

Q: Is it your understanding that someone who wants to transfer, an

According to Muir, Manigault approached her after Baxter received the position and complained that it was "unfair" that he did not receive an offer from the position. (Muir Aff. ¶ 24.) Muir stated that plaintiff acknowledged that he never applied for the position. (Muir Aff. ¶ 25.)

Manigault stated as follows regarding the position Baxter received:

> Senior Citizen acquired full-time position with no prior training. Prior to pending operation, a full time position would provide better medical coverage for his operation. One position was open for full-time position. At least five part-time employees were interested in this position. There was only one allegedly request received by Good Samaritan. That was request was submitted by

---

employee who wants to transfer, has to put in a written application or written request in response to a posting?
A: I guess that's the norm.
       \*\*\*
Q: Do you have an understanding that if you've got some disciplinary notice or memo in your file that you cannot transfer or be promoted into another position for, at least, twelve months?
A: So I heard.
Q: Is that your understanding, sir?
A: Yeah, that's what I heard.

(Manigault Dep. at 120.)

John Baxter. This job was given to an inexperienced senior citizen with health problems. To this fact, I think my problems were created due to my inquiries about Mr. [Baxter], an inexperienced employee acquiring this full time position."

(Manigault Aff. at 2-3.)

Further, at his deposition, Manigault testified:

But I wasn't considered because I had a disciplinary. A junk disciplinary. You would stop some grown person from stepping up another level because of some immature stuff like that? I mean, that really just gets on my nerves. That really gets on my nerves and that's why I'm acting like I'm acting because I don't appreciate being told stuff like that or made to look like an incompetent, bad worker. That's not good for me when I go for another job and it hasn't been good for me.

(Manigault Dep. at 494.)

### (2) Part-Time Position

On or about October 7, 2005, Manigault applied for a transfer to a part-time position at the nursing home. (Def.'s 56.1 ¶ 72.) Plaintiff's application for transfer was denied because of his recent disciplinary history. (Def.'s 56.1 ¶ 72.)

### I. Termination

According to Spina, on or about May 10, 2006, Muir and Michael Quartararo – the nursing home's Administrator – contacted Spina to request that plaintiff's employment "be terminated as a result of his continued poor work performance and serious violations of Hospital infectious materials control policy." (Spina Aff. ¶ 11.) Spina reviewed the request with Richard J. Murphy, defendant's President and Chief Executive Officer. (Spina Aff. ¶ 12.) "Based upon Plaintiff's well-documented history of poor work performance, which included serious violations of the Hospital's infectious materials control policy, it was determined that Plaintiff's employment with the Hospital would be terminated." (Spina Aff. ¶ 12; *see also* Spina's Handwritten Notes of conversation with Murphy, dated May 10, 2006 (describing plaintiff's disciplinary infractions, such as "wearing dirty gloves in + out of rooms").)

When Manigault learned he had been terminated, he "became agitated, used several expletives and tore the notice into several pieces." (Def.'s 56.1 ¶ 94.)

Manigault stated as follows regarding his termination: "I feel I was wrongly terminated from a job that was very important to me as well as my fiancee that is still employed at that facility, so there would be no reason to collect such an amount of written violations which were more slander rather than truth. These accusation would total more than enough broken rules to terminate an employee." (Manigault Aff. at 3.)

### II. PROCEDURAL HISTORY

Manigault filed this action on October 19, 2006. Defendant answered the complaint

on December 12, 2006 and filed the instant motion on February 15, 2008. Plaintiff submitted his opposition on March 20, 2008 – three days after the opposition was due according to the Court's briefing schedule. By letter dated March 25, 2008, defendant requested that the Court reject plaintiff's opposition papers because he submitted them late. By Order dated March 25, 2008, the Court denied defendant's request. Defendant submitted its reply on April 1, 2008.[8] The Court has fully considered the submissions of both parties.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw

all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

---

[8] In addition, by Order dated August 21, 2008, the Court required that defendant produce a complete copy of plaintiff's deposition transcript for the Court's review. Defendant had previously only produced portions of this transcript and, in an abundance of caution – and because plaintiff was proceeding *pro se* – the Court wished to review the transcript in its entirety. Defendant produced the transcript on August 25, 2008 and, as stated *supra*, the Court has carefully and completely reviewed it.

Moreover, where the plaintiff is proceeding *pro se*, the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Though a *pro se* litigant's pleadings are afforded wide latitude, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Instead, to overcome a motion for summary judgment, the non-moving party "must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (internal citations omitted); *see also Morris v. Ales Group USA, Inc.*, No. 04-CV-8239 (PAC), 2007 U.S. Dist. LEXIS 47674 2007 U.S. Dist. LEXIS 47674, at *10 (S.D.N.Y. June 28, 2007) ("[T]o survive summary judgment, plaintiff's facts 'must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.'") (quoting *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n.14 (2d Cir. 1981)).

In addition, the Second Circuit has provided specific guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## IV. DISCUSSION

### A. Plaintiff's Termination

#### (1) Legal Standard

Because plaintiff presents no direct evidence of discriminatory treatment based on his race, the Court reviews his claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of racial discrimination under Title VII, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has

characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas's* minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

(2) Application

The Court assumes, for the purposes of this motion, that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. In response, defendant has established a legitimate non-discriminatory reason for his dismissal, namely, plaintiff's alleged failure to perform his job adequately and to behave appropriately during his time at the nursing home. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find race discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y. 1999), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley v. Columbia Univ. – Coll. Of Physicians & Surgeons*, 999 F. Supp. 506,

515 (S.D.N.Y. 1998).

In support of its position that plaintiff was fired due to his failure to perform his job adequately and to behave appropriately, defendant points to numerous pieces of evidence – as described *supra* – to demonstrate plaintiff's poor job performance and inappropriate behavior: (1) Martelack's affidavit demonstrating that plaintiff took an unauthorized smoke break on December 9, 2004 and did not, therefore, respond to a page requesting plaintiff to mop up a spill; (2) Martelack's affidavit and his corresponding handwritten notes demonstrating that, on or about February 7, 2005, nursing staff observed plaintiff carrying garbage to the dumpster without using a sanitary garbage cart; (3) Martelack's affidavit and his corresponding handwritten notes demonstrating that, on February 14, 2005, plaintiff failed to complete a vacuuming task assigned to him that day; (4) Muir's affidavit explaining that, on May 25, 2005, plaintiff was in a verbal altercation with a co-worker; (5) Muir's affidavit stating that, on or about June 15, 2005, she observed plaintiff watching television in the patient recreation room on an unauthorized break; (6) plaintiff's suspension without pay for three days in June 2005 for failure to obtain authorization for breaks and to take such breaks in authorized areas; (7) Brady's affidavit stating that, on May 2, 2006, she observed plaintiff speaking with a nursing aide in an unauthorized area; (8) Brady's affidavit stating that, on May 9, 2006, she observed plaintiff pushing a clean garbage cart between two patients' rooms with dirty gloves and after failing to wash his hands. In addition, as described *supra*, plaintiff engaged in all of this behavior despite receiving relevant training and, in several instances, after receiving prior warnings that his behavior was unacceptable. Moreover, as also described *supra*, defendant has produced numerous Disciplinary Action Notices plaintiff received that correspond with – and corroborate – plaintiff's disciplinary infractions.

Plaintiff makes a futile attempt to try to undermine these articulated, non-discriminatory grounds for termination or to create factual issues regarding these grounds. However, as set forth below, rather than dispute that any of these complaints or incidents occurred, plaintiff merely provides explanations for his failure to perform his job satisfactorily or tries to minimize the significance of each incident, *i.e.,* to dismiss his serious disciplinary infractions as "bogus immaturity." For instance, as the Court set forth above, plaintiff's deposition includes a detailed admission of his failure to comply with the nursing home's hand washing policy, which the nursing home has instituted in order to protect patients with compromised immune systems. Specifically, as the Court also set forth above, although plaintiff attempts to justify his failure to comply with the infectious disease control procedures by stating that he "opted" to use his own, more "efficient" procedures, plaintiff does not deny that he "sometimes" failed to comply with defendant's actual policy, explaining "[w]ait a minute. I'm not going to tell you I wash my hands from each room to each room less than five feet apart."[9] In addition, with respect to the altercation with a co-worker, as stated *supra*, plaintiff does not dispute that the altercation occurred but attempts to justify his continued participation in the altercation on the grounds that the co-worker was "talking to [plaintiff's] neck." Similarly, with respect to the unauthorized smoking break – or, at best, plaintiff's smoking while working – plaintiff simply asserts: "You know what, whatever. Yeah, I was smoking. So what?" Needless

_____

[9] Plaintiff also states, as described above, that Brady lied in her affidavit about plaintiff's compliance. However, given that plaintiff admits to the substance of Brady's allegations, the Court cannot discern the meaning or significance of plaintiff's claim that Brady was lying.

to say, such futile justifications – coupled with plaintiff's clear admissions of wrongdoing – completely fail to undermine in any way the strength of defendant's articulated, non-discriminatory reason for the termination.

Further, Manigault has failed to offer any evidence whatsoever to suggest that his race played any role in his termination. In particular, plaintiff either does not dispute or provides no evidence to contradict the evidence offered by defendant and, instead, relies solely on his own conclusory statements in an attempt to create genuine issues of fact for trial. In fact, the Court notes that, although plaintiff's complaint states that he was terminated on the basis of race, plaintiff made no such assertion in his deposition or opposition papers. Instead, plaintiff makes vague and generalized statements regarding people being "out to get" him or proceeding with an "ulterior motive" against him, such as the following statements from plaintiff's deposition:

> Q: In your opinion, is receiving a disciplinary action notice serious business?
> A: It could be depending on the seriousness of the infraction which this is crap. This is like dumb immature childish responses. This is dumb. Do you know why it's dumb, because I'm a grown man. I don't see the relevance to writing up a bunch of immature disciplinary actions on me unless there was some ulterior motive behind it and that's how I feel. That's how I feel.
> Q: What makes you feel that way, sir?
> A: Well, if you add all of these up and you look at what was written, very childish, very immature. Very I'm-out-to-get-you.

> Q: Who was out to get you?
> A: It could be anybody.

(Manigault Dep. at 214-15.) Similarly, in his opposition papers, plaintiff made the following statement: "I feel I was wrongly terminated from a job that was very important to me as well as my fiancee that is still employed at that facility, so there would be no reason to collect such an amount of written violations which were more slander rather than truth. These accusations would total more than enough broken rules to terminate an employee." As these statements illustrate, plaintiff does not even attempt to explain how race played a role in his termination.[10] Indeed, at plaintiff's deposition, defendant's counsel directly asked him what was "discriminatory" about plaintiff's termination. Plaintiff responded: "What was discriminatory was the fact that I was terminated for something I shouldn't have terminated for and I have seen other people do worse things." (Manigault Dep. at 315.)

However, in a motion for summary judgment, the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

---

[10] In fact, the sole mention of race in plaintiff's opposition papers or deposition relates to his allegation that white employees did not have to wear a uniform to work. Although the Court discusses that baseless and conclusory allegation in greater detail *infra*, it bears mentioning at this juncture that plaintiff was never disciplined for any failure to wear his uniform. In fact, as stated above, Martelack testified that plaintiff fully complied with this requirement. Thus, it is undisputed that the uniform issue played no role in plaintiff's termination.

1995) (internal quotation marks and citation omitted). Here, plaintiff's allegations of discrimination relating to his termination are based solely on the above-referenced conclusory statements and personal beliefs. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) (holding assertion of personal beliefs insufficient to show pretext), *cert. denied*, 520 U.S. 1228 (1997). Plaintiff has not presented any direct or circumstantial evidence from which a reasonable fact-finder could infer a causal relationship between the plaintiff's race and his termination. Moreover, to the extent that plaintiff disagrees with the Disciplinary Action Notices he received, it is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination. *See, e.g., McLee*, 109 F.3d at 135 (finding summary judgment appropriate on Section 1981 and Title VII discriminatory discharge claims where plaintiff's "disputations [of his employer's proffered explanations] were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried"); *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's] investigation was sufficiently thorough or fair"); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination . . . were false or a pretext for discrimination."); *Ricks v. Conde Nast Publ'ns., Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) ("The mere fact that an employee disagrees with her employer's assessments of her work . . . cannot[,] standing on its own[,] show that her employer's asserted reason[s] for termination [were] pretextual.") (internal citation omitted); *see also D'Cunha v. N.Y. Hosp. Med. Ctr. of Queens*, No. 02 Civ. 5445 (DLI), 2006 WL 544470, at *6 (E.D.N.Y. Mar. 6, 2006). An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).[11]

---

[11] In addition, although it is well settled that a plaintiff can raise an inference of discrimination by showing disparate treatment, *see Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999), plaintiff provides no such evidence. In fact, at his deposition, although plaintiff suggests in a vague and conclusory manner that other employees were treated differently from him, he affirmatively refused to provide their names or any other specific information about them:

> Q: Okay. Sir. You said a number of things there. You have now said a couple times, you testified a couple times that there were supervisors that were doing things that they were not written up for. There were other employees, supervisors going out on unauthorized breaks and other employees doing things that they were not written up for but you were written up for. Could you tell me in each instance who these people are and what they were doing and should have been written up on?
> A: No. I couldn't and if I could, I wouldn't.
> Q: Why not?

Thus, plaintiff's conclusory arguments attempt to raise issues, if at all, only as to the accuracy or the wisdom of defendant's decision to terminate plaintiff, but fail to create a triable issue as to whether defendant's proffered reasons were a pretext for discrimination. However, because federal anti-discrimination law "may not be used as a vehicle for second-guessing an employer's business judgment," the Court finds that plaintiff's arguments fail to provide any basis for a reasonable jury to infer that defendant discriminated against plaintiff on the basis of his race. *See, e.g., Brown*, 194 F. Supp. 2d at 191; *see also Argueta v. N. Shore Long Island Jewish Health Sys., Inc.*, No. 01 Civ. 4031 (JG), 2003 WL 22670915, at *9 (E.D.N.Y. Nov. 6, 2003) ("It is not the province of this Court, however, to second-guess the nondis[c]riminatory business decisions of private employers.").

In sum, considering the evidence as a whole, and viewing all the evidence in the light most favorable to plaintiff, no reasonable jury could find that plaintiff was terminated because of his race. Although plaintiff has offered several arguments to defeat summary judgment, "their combined weight is negligible, and no disputed material issues of fact remain." *Pisana v. Merrill Lynch & Co.*, No. 93 Civ. 4541 (LMM), 1995 U.S. Dist. LEXIS 10296, at *29 (S.D.N.Y. July 20, 1995) (granting summary judgment as to ADEA claim). Plaintiff has put forth no evidence, other than the fact of his race, from which discrimination could be inferred. That single fact is countered by the undisputed, overwhelming evidence weighing against plaintiff's allegations – namely, that plaintiff was terminated after numerous incidents and complaints from multiple employees regarding his poor performance and inappropriate behavior. Thus, in light of the single fact offered in support of plaintiff's claims – that is, plaintiff's race – and the overwhelming evidence weighing against an inference of discriminatory intent, no reasonable jury could find that plaintiff was fired because of his race. Indeed, the only reasonable conclusion is that plaintiff was fired based on his job performance and inappropriate behavior. The Court recognizes that it must proceed with great caution in granting summary judgment in discrimination cases where intent, as drawn from inferences, is a core issue. However, as the Second Circuit has noted, "[t]o allow a party to defeat a

---

A: I just wouldn't.

Q: To the extent that you have that knowledge, you have to answer my question.

A: There is no reason. I just wouldn't. There is no reason for me to spill out anybody else's guts other than mine.

Q: Are you telling me that you can't name any of these people?

A: I'm not going to.

\*\*\*

Q: Give me one example –

A: You have got to be kidding me if you are going to tell me that I have no knowledge of this after I have been working in that nursing home for almost four years. Don't tell me I haven't seen a number of things. I have seen a lot.

Q: Give me one example of an employee that was not written up for doing something they were supposed to be doing.

A: Supervisors go outside on the backside of the building all day off and on all day long. Supervisors, employees, maintenance, housekeeping, you name it, they are out there.

(Manigault Dep. at 225-27.)

motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). That is precisely the situation here. Plaintiff relies on pure speculation and has not produced sufficient evidence to support a rational finding that, more likely than not, plaintiff's race was the real reason for the termination. Accordingly, the Court finds that plaintiff has failed to raise a genuine question of fact as to the Title VII claim based on his termination and grants defendant's motion for summary judgment on this claim.

## B. Failure to Promote

### (1) Legal Standard

With respect to a discriminatory failure to hire or promote claim, the *McDonnell Douglas* test again applies. Thus, plaintiff must first establish a *prima facie* case of unlawful discrimination by showing that (1) he is a member of a protected category; (2) he applied for an available position; (3) he was qualified for the position; and (4) he was rejected under circumstances that give rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000). "An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [] or if the position was filled by someone not a member of plaintiff's protected class." *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802).

### (2) Application

Again, the Court assumes that Manigault has demonstrated a *prima facie* case of discrimination regarding defendant's failure to promote him to the full-time or part-time positions described *supra*. Further, defendant has articulated a legitimate non-discriminatory reason for not promoting plaintiff.

However, even viewing all the evidence in a light most favorable to Manigault, there is nothing in the record to support any assertion that plaintiff's failure to be promoted was based on discriminatory animus. Specifically, it is undisputed that, based on defendant's policies, plaintiff was ineligible for both the full- and part-time transfer positions because of his recent disciplinary activity.

Moreover, plaintiff has failed to submit any evidence to support the unsubstantiated allegation that he was not promoted because of his race. *See Norton*, 145 F.2d at 119. Indeed, after carefully reviewing plaintiff's deposition testimony and written submissions to the Court in the light most favorable to plaintiff, the Court has found absolutely no evidence that racial discrimination played any role in defendant's decision not to promote him. In fact, as the following colloquies reflect, plaintiff conceded at his deposition that he was simply angry that Baxter received a promotion because Baxter was much older and more "sickly" than plaintiff, even though plaintiff was aware that he was ineligible for the position Baxter received:

> Q: Tell me how failure to promote was discriminatory in your words?
> A: Failure to promote was discriminatory, as far as I'm concerned, because a senior worker which was not there as long as I was promoted to a full-time position when I don't think he should have been.

> ***

Q: So your problem is that he got a position and he is older than you?
A: No. My problem is that he got a position and I have been working there longer than he has. He doesn't know all the functions of the job or didn't at the time. He wasn't actually capable of doing the work because of being sickly.

\*\*\*

Q: Why did you write that?
A: I wrote it because I thought it was unfair that they gave somebody that just practically came in after other people were there two and three years before him and give him a full-time position. Plus the fact that he is 70 years old and sickly. I think that was dead wrong. I don't care if I wasn't eligible or not. It was wrong. He had no experience. He didn't know what he was doing half the time. That was ridiculous.

(Manigault Dep. at 315-16, 349-50.) Under these circumstances, the undisputed facts clearly demonstrate that race played absolutely no role in Baxter's receiving the transfer position. No reasonable jury, therefore, could conclude that Manigault's race played any role in defendant's decision not to promote him.

Alternatively, plaintiff's failure-to-promote claim is defective because he has failed to provide the Court with evidence that he applied for specific positions for which he was qualified and was rejected. With respect to the full-time position Baxter received, defendant has provided evidence – namely, as described above, the Muir Affidavit – that plaintiff never

applied for this position and that plaintiff conceded his failure to so apply in a conversation with Muir. In response, as stated above, plaintiff has merely asserted that he generally spoke to a "supervisor" about the position. Such a conclusory assertion is insufficient to survive summary judgment. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) ("We read *McDonnell Douglas* and *Burdine* generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion. This general mandate ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer."). Moreover, with respect to the part-time position for which plaintiff did apply, it is undisputed that, as with the full-time position, he was disqualified because of his recent disciplinary infractions. Therefore, plaintiff has not pointed to any evidence that his applied for any position for which he was qualified and was denied that position – much less that plaintiff was denied any such position because of his race. *See McCalla v. SUNY Downstate Med. Ctr.*, 03-CV-2633 (JFB), 2006 WL 1662635, at *7 (E.D.N.Y. June 8, 2006) (dismissing failure to promote claim where plaintiff failed to allege that he applied for or was qualified for an actual position).

In sum, the Court grants summary judgment to defendant on plaintiff's failure-to-promote claim.

C. Hostile Work Environment

After carefully reviewing the record in this case, including the complaint, plaintiff's deposition, and his written submissions, it remains unclear to the Court whether plaintiff is also asserting a claim of hostile

21

work environment pursuant to Title VII. In any event, because the complaint mentions "harassment," the Court has – in an abundance of caution – considered whether such a claim would survive summary judgment. For the reasons set forth below, the Court has concluded that summary judgment is also warranted on this claim.

### (1) Legal Standard

A hostile work environment, in violation of Title VII, is established by a plaintiff showing that his workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993), *abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998); *see Feingold v. New York.*, 366 F.3d 138, 150 (2d Cir. 2004); *see also Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003); *Richardson v. N.Y. Dep't of Corr. Servs.*, 180 F.3d 426, 437 (2d Cir. 1999), *abrogated on other grounds, Burlington N. and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz*, 202 F.3d at 570.

The Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to demonstrate a hostile work environment. *See Richardson*, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley*, 217 F.3d at 154 (quoting *Harris*, 510 U.S. at 23).

### (2) Application

Here, after carefully reviewing the entire record in this case, including plaintiff's deposition, the Court concludes as a matter of law that the alleged discriminatory conduct by defendant fails to rise to the severe level required to support a claim of hostile work environment. In particular, based on the complaint, plaintiff's deposition, and his opposition to the motion, it appears plaintiff could attempt to argue, at most, that the following circumstances or incidents support his claim of hostile work environment: (1) alleged "harassment" by Brady in the form of "picking on" plaintiff;[12]; (2)

---

[12] At his deposition, however, in response to a direct inquiry, plaintiff failed even to attempt to link Brady's alleged "harassment" with racial discrimination:

> Q: Did you check off race?
> A: I did.
> Q: Why did you check off race?
> A: Because that's what I felt at the time.
> Q: What's your evidence of being discriminated against on account of race?

A: Well, I felt I was being harassed on a racial basis because I have never seen her harass anybody else in my department for anything else. It just so happens that that particular day when the Health Department was there, I guess she was nervous or whatever-have-you to the fact that they were there and maybe she had a bad day and decided to find someone to pick on and it was me.

> Q: You stated you never witnessed her harass anyone else in your department other than you, correct?
> A: She basically walked past people in my department without even speaking, so no. She did not.

Muir's comment to plaintiff that "she could fire [plaintiff's] blak [sic] ass if [he is] not careful";[13] and (3) plaintiff's claim that defendant forced him to wear a gray uniform while certain white employees "wore blue jeans and white t-shirts without consequence."[14]

---

Q: And the people in your department were what racial background, black, correct?
A: Yes.
Q: White, correct?
A: Yes.
Q: Hispanic, correct?
A: Yes.
Q: Where there other categories? Asian?
A: No.
Q: But you were the only one that, according to you, she harassed?
A: Yes.
Q: So she didn't harass any of the other black employees, correct?
A: I don't know if she did or if she didn't. She might have when I wasn't around. No one has spoken to me about it but that doesn't mean it didn't happen.
Q: You didn't witness it though, right?
A: No.

(Manigault Dep. at 372-73.)

[13] The Court notes that plaintiff did not mention this alleged statement in his deposition. The Court further notes that, although defendant stated in its Memorandum of Law that this alleged statement of Muir's was included in plaintiff's complaint, the statement actually appears in plaintiff's interrogatory responses.

[14] The Court notes that plaintiff has failed to submit any evidence to corroborate his assertions that certain white employees were exempt from the dress code. In fact, the sole piece of evidence he has proffered on this issue is a photograph depicting white employees in gray t-shirts. (*See* Soric Exh. C.) Given that defendant admits that employees

However, even viewing the evidence in the light most favorable to plaintiff, the Court finds that these examples are at best "episodic," and are not "sufficiently continuous and concerted in order to be deemed pervasive" and, therefore, plaintiff's hostile work environment claim fails to survive summary judgment. *See Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)); *see, e.g., Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (noting that "[i]solated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment") (citation omitted); *Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002) (finding the alleged conduct non-actionable when the incidents were "too few, too separate in time, and too mild. . . . to create an abusive working environment"); *Trinidad v. N.Y. City Dep't of Corr.*, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a bitch and making sexual remarks over the course of her five and one-half years of employment insufficient to support a claim of discriminatory harassment); *Augustin v. Yale Club of N.Y. City*, No. 03 Civ. 1924 (KMK), 2006 U.S. Dist. LEXIS 67462, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding that "four or five" comments over a five-year period insufficient to support a hostile work environment claim); *Mark v. Brookdale Univ. Hosp.*, No. 04 Civ. 2497 (JBW), 2005 U.S. Dist. LEXIS 12584, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (finding two "alleged isolated remarks" by plaintiff's supervisor insufficiently "frequent and pervasive"); *Pagan v. N.Y. State Div. of Parole*, No. 98

---

were permitted to wear gray t-shirts, this photograph, therefore, only serves to undermine plaintiff's version of events.

Civ. 5840 (FM), 2003 U.S. Dist. LEXIS 20752, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding that two racially derogatory remarks by supervisor directly to plaintiff did "not amount to the sort of 'extremely serious' behavior required to give rise to a hostile work environment under Title VII") (citations omitted); *Hawana v. City of New York*, 230 F. Supp. 2d 518, 533 (S.D.N.Y. 2002) (finding single remark by supervisor insufficient); *Upshur v. Dam*, No. 00 Civ. 2061 (DC), 2003 U.S. Dist. LEXIS 628, 2003 WL 135819, at *7-*8 (S.D.N.Y. Jan. 17, 2003) (finding one week of "patronizing and racist comments" by supervisor insufficient); *Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 335 (S.D.N.Y. 2002) (finding that supervisor's use of racially derogatory slur to refer to defendant on four or more occasions does not alter conditions of employment significantly enough to implicate Title VII).[15]

## V. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 2, 2008
Central Islip, NY

* * *

Plaintiff is represented by Gilbert Manigault, 45 Chapman Place, Bay Shore, NY, 11706. Defendant is represented by Mary Ellen Donnelly, Esq., Putney, Twombly, Hall & Hirson LLP, 521 Fifth Avenue, New York, NY, 10175.

---

[15] The Court is aware that plaintiff checked the box next to "unequal terms and conditions of my employment" on his form complaint. However, to the extent plaintiff brings such a claim, it also fails for the reasons set forth *supra* – namely, plaintiff has failed to proffer any evidence that he was treated differently from any other employee at the nursing home.